**LUTZ ENGINEERING CO., INC.**

v.

**INDUSTRIAL LOUVERS, INC.**

**and**

**Lev Zetlin Associates, Inc.**

**No. 89–94–Appeal.**

Supreme Court of Rhode Island.

Jan. 18, 1991.

Richard M. Petrocelli, Visconti & Petrocelli, Ltd., Providence, for plaintiff.

James T. Murphy, Hanson, Curran, Parks & Whitman and Robert J. Quigley, Jr., Higgins, Cavanagh & Cooney, Providence, for defendants.

## OPINION

SHEA, Justice.

This case is before the Supreme Court on appeals by codefendants from judgments against them following a jury trial in the Superior Court. We reverse.

The factual background of this lawsuit is somewhat complex. The claims arise out of the construction of a large manufacturing building for the General Dynamics Corporation at Quonset Point in North Kingstown, Rhode Island. The building was to be an automated welding facility for the fabrication of sections of the hulls of submarines built by General Dynamics, Electric Boat Division. This litigation was related to a number of large louvered panels that were installed in the building.

General Dynamics had retained the Perini Construction Company (Perini) as its general contractor. Perini entered into a contract with Lev Zetlin Associates, Inc. (Lev Zetlin) to serve as the architect-engineering firm for the project. The Lev Zetlin/Perini contract was entitled "Agreement for Architectual/Engineering Services." It described the nature of Lev Zetlin's services and provided in pertinent part: "Review of shop drawings, samples and other submittals of the Contractor is only for general conformance to the design concept of the project and for general compliance with the contract documents."

Perini also entered into contractual arrangements with numerous subcontractors who would be responsible for carrying out various aspects of the project. To that end, Perini entered into a written contract with the Lutz Engineering Co., Inc. (Lutz), to serve as the heating and ventilation subcontractor for the project. Under the

Lutz/Perini contract, Lutz was required to perform all work "in accordance with Project Drawings and Specifications." The work was to be done "to the satisfaction of Perini Project Superintendent." Under article X of the Lutz/Perini contract, the contractor (Perini) and the principal (General Dynamics) were authorized to inspect Lutz's work, and if the work was in any way failing to meet the specifications, the "Subcontractor [Lutz] at his own expense shall make good all his Work * * *." Significantly, nothing in the Lutz/Perini contract made Lutz's work contingent upon any approval by Lev Zetlin.

Article XXII of the Lutz/Perini contract is entitled "Shop Drawings." In pertinent part, that section provides:

"[T]he Subcontractor shall prepare at his own expense and furnish promptly whenever requested by the Contractor any number of prints of his shop drawings * * * or any other data that may be necessary in the opinion of the Contractor * * * for the proper prosecution of the Work. The Subcontractor shall lay out his own work and be responsible for the accuracy of same. The Subcontractor shall exercise the utmost diligence to obtain all drawings, details, and information necessary to perform his work * * *. The Subcontractor shall, before proceeding with any affected part of the Work, call to the Contractor's attention in writing any errors in or inconsistencies between or in any of the Contract Documents."

The Lutz/Perini contract also provided a guarantee in article XXI by which the subcontractor (Lutz) "shall guarantee his Work against all defects of materials and/or workmanship as called for in the Original Contract." Again there was no requirement that Lutz's work be accepted or approved by Lev Zetlin. In fact, Lutz and Lev Zetlin did not enter into any contractual relationship with each other. Moreover, neither Lutz nor Lev Zetlin was even mentioned or referred to directly or indirectly in the other's contract with Perini.

The Lev Zetlin/Perini contract contained several provisions not contained in the Lutz/Perini contract. Among these was an arbitration clause that required arbitration of all claims, disputes, and other matters "arising out of, or relating to, this Agreement or the breach thereof * * *." The Lev Zetlin/Perini contract also provided that the law of Massachusetts would govern the terms contained therein. Any disputes, therefore, between Lev Zetlin and Perini arising out of this project would be resolved by binding arbitration in accordance with Massachusetts law.

Preliminary to the construction of the building a number of drawings and specifications were prepared and issued. These specifications set forth certain dimensions with respect to the louvers at issue and also certain performance specifications. The performance specifications included in part:

"All blades shall be storm proof type * * *. When the louver is placed in the closed position, the vinyl gaskets shall effect positive closure, the full width of each blade. * * * Louvers shall be similar to Air Stream Model–MO; Construction Specialities, Inc., Model 6870M; Louvers and Dampers, Inc. Model AEL–6–353 or approved equal."

Lutz received these specifications through the general contractor, Perini. Lutz itself did not fabricate the louvers but instead solicited bids for their fabrication. Lutz selected Industrial Louvers (Industrial), the lowest of four bidders, for fabrication of the louvers. Thereafter, Lutz issued a purchase order to Industrial. Industrial was not one of the companies specifically mentioned in the specifications whose products would serve as the standard to which the louvers would have to conform.[1]

---

**1.** Edmund A. Lutz testified on cross-examination that when a number of models are referred to in specifications by means of the phrase "similar or approved equal," the intent is to convey to the subcontractor a standard of performance rather than an exact description of the item itself.

Industrial prepared a set of shop drawings of the louvers and delivered them to Lutz.[2] Lutz forwarded the shop drawings to Perini. They were returned to Lutz not approved. It was noted on the returned shop drawings that they were rejected because they did not meet an air-leakage requirement. A notation on the returned drawing read, "[Air] leakage shall not exceed 1.75 cfm per square foot closed at thirty mile per hour wind." Lutz returned the drawings to Industrial. The testimony about what then followed is in dispute.

Edmund A. Lutz (Mr. Lutz), the president and sales manager, testified for Lutz Engineering. James Sterriker (Sterriker), president of Industrial Louvers, testified for Industrial. Sterriker said that after receipt of the rejected shop drawings, he telephoned Lutz Engineering and spoke to Mr. Lutz. Sterriker testified that he informed Mr. Lutz that he could not meet the louver specifications now indicated on the rejected shop drawings within his quoted price. The air-leakage requirements were not part of the original specifications of which Sterriker was aware when his bid was made. In his testimony Mr. Lutz agreed that the 1.75 cubic-foot per minute (cfm) specification was not in the original specifications. Sterriker also testified that Mr. Lutz responded that he, Sterriker, should ignore the notation since the air-leakage requirement was not part of the original specifications and the louvers would usually be open anyway owing to the amount of heat generated by the welding activity.

In his testimony Mr. Lutz said that Sterriker did inform him that compliance with the air-leakage requirement would necessitate additional cost. However, Mr. Lutz testified that he responded that Sterriker would have to comply with the air-leakage requirement or object to compliance in writing.

Although dispute exists regarding what was actually said during that telephone conversation, there is no question that Mr. Lutz never at any time informed Lev Zetlin or Perini of the conversation. There is also no question that the 1.75 cfm air-leakage requirement was a new requirement that was not in the original specifications.

In due course Industrial resubmitted shop drawings to Lutz. These shop drawings included revisions of the original shop drawings, but they did not contain any written objection to the air-leakage requirement. Moreover, the resubmitted shop drawings did not provide for any change in the air leakage. Significantly, the resubmitted shop drawings were passed along by Lutz to Perini without comment. They were subsequently returned to Lutz by Lev Zetlin approved.

Thereafter the louvers were fabricated by Industrial according to the resubmitted, approved shop drawings and were shipped to Rhode Island and installed. When winds and rain began, the louvers began to leak. Perini took the position that Lutz, as subcontractor, was responsible for making the louvers comply with the specifications and therefore Perini withheld a sum of money as a retainage fee.[3]

Lutz subsequently undertook to repair the louvers and did eventually bring them into satisfactory compliance with the air-leakage specifications. Lutz notified Industrial of the problem, but Sterriker refused to assist in the repairs and refused to acknowledge any responsibility. Mr. Lutz acknowledged he had never notified Lev Zetlin about the problem even during the two-year period his company was repairing the louvers and bringing them into compliance with the specifications. Moreover, Lutz did not seek any contribution from Lev Zetlin either by way of expert advice or money up until the day suit was filed. Mr. Lutz also never intimated to Perini that

---

2. Shop drawings are prepared by a manufacturer and are submitted to a contractor or subcontractor who consults the architect or engineer before accepting them.

3. Retainage is a sum of money that the owner of a project or a general contractor holds back until the job is done and has been inspected and everyone is satisfied that the materials and workmanship are satisfactory.

it considered Lev Zetlin in any way responsible for the louver problem.

At the close of plaintiff's case and again at the close of all evidence, motions for directed verdicts by both defendants were granted in part and denied in part. The court instructed the jury on the law of negligence in the case against Lev Zetlin and breach of contract in the case against Industrial.

The jury returned a verdict against Lev Zetlin based on the theory of Lev Zetlin's negligence in approving the resubmitted shop drawings. In response to special interrogatories the jury found the reasonable cost of repairs to be $19,515, and it found comparative negligence on the part of Lutz to be 23 percent. The jury also found that Industrial breached its contract with Lutz by manufacturing louvers that failed to seal out the wind and rain. Both defendants' motions for new trial were denied, and timely appeals were filed to this court.

After a careful examination of the evidence presented at trial, we are of the opinion, for the reasons that follow, that both defendants· are entitled to relief on appeal. Lev Zetlin was entitled to a directed verdict. Industrial is entitled to a new trial.

■ We shall consider Lev Zetlin's appeal first. In reviewing a trial justice's ruling on a motion for a directed verdict, this court must examine the evidence in the record, draw all reasonable inferences that can be drawn in the light most favorable to the plaintiff and not evaluate the credibility of the witnesses or weigh the evidence. *Brenner Associates, Inc. v. Rousseau,* 537 A.2d 120 (R.I.1988); *Solitro v. Moffatt,* 523 A.2d 858 (R.I.1987); *Gordon v. St. Joseph's Hospital,* 496 A.2d 132 (R.I.1985). If there is evidence supporting the nonmoving party or evidence on which reasonable minds can differ, the jury is entitled to decide the facts and the motion should be denied. *Marcotte v. Harrison,* 443 A.2d 1225 (R.I. 1982).

■ An action in negligence can be maintained when a plaintiff shows that a defendant breached a duty of care owed to the plaintiff and this breach proximately caused an injury to the plaintiff resulting in actual damages. *Forte Brothers, Inc. v. National Amusements, Inc.,* 525 A.2d 1301 (R.I.1987).

■ The case against Lev Zetlin was submitted to the jury on a theory of negligent review of the shop drawings. That claim is viable under the law, however, only if Lev Zetlin owed a duty of care to Lutz. We conclude that Lev Zetlin did not owe a duty of care to Lutz. Lutz obviously attempted to use Lev Zetlin's resources, talent, and engineering expertise in order to meet Lutz's own contractual responsibilities to Perini. Lutz had no right to do so. The Lev Zetlin/Perini contract provided that Lev Zetlin would review "Shop drawings, samples and other submittals of the Contractor [Perini] * * * only for general conformance to the design concept of the project and for general compliance with the contract documents." This detailed and fairly comprehensive agreement provided for the resolution of any difficulties arising out of it by arbitration and according to the law of Massachusetts. The Lev Zetlin/Perini contract, by its terms, never created or even contemplated a duty of care owed by Lev Zetlin to anyone but Perini.

Conversely, Lutz was obligated by the terms of the Lutz/Perini contract to lay out and be responsible for its own work. Lutz also agreed to exercise the utmost diligence to obtain all drawings, details, and information necessary to perform Lutz's own work. And, of considerable importance, Lutz contractually obligated itself, before proceeding with any part of the work, to give Perini written notification of "any errors in or inconsistencies between or in any of the Contract Documents."

Thus, Lev Zetlin's and Lutz's responsibilities to Perini were separate and distinct. Under the Lutz/Perini contract, Lutz assumed complete responsibility for its work. Lutz had no right to transfer to Lev Zetlin the responsibilitý Lutz owed to Perini by way of shop drawings that Lev Zetlin reviewed only as Perini's architect-engineer.

Lutz's obligation to perform under the Lutz/Perini contract rested solely with

Lutz. Thus, if Lutz's supplier's products failed to meet specifications, Lutz was answerable to Perini. Clearly Lev Zetlin owed no duty of care to Lutz, and without a duty there can be no breach. Consequently Lev Zetlin was entitled to a directed verdict against Lutz.

Lutz argued in the trial court and before us that this case is controlled by our holding in *Forte Brothers, Inc. v. National Amusements, Inc.*, 525 A.2d 1301 (R.I. 1987). In that case we ruled that an architect was responsible to a contractor in a negligence action although the parties were not in privity. That case, however, arose out of a factual situation vastly different from this case. Forte, a contractor, was unable to be compensated fully for the quantity of mass rock and boulders it had removed from a construction site. That removal process was to be monitored and recorded by the architect-site engineer. We held that the contractor was damaged and suffered economic loss that was directly due to the architect-site engineer's failure properly to record the quantity of rock and boulders removed from the site. Forte was in a position wherein it had to rely on the architect's record keeping regarding the removal of rock and boulders because Forte would be compensated for rock removal only in the amounts the architect-engineer reported had been removed. The architect-engineer therefore had a *direct* responsibility to Forte, the contractor, whose payment was dependent on the architect-engineer's records. Our holding in *Forte*, therefore, has no application to this case.

Lutz also argued in the trial court that it was a third-party beneficiary of the Lev Zetlin/Perini contract. The trial justice correctly directed a verdict on that issue. *See Blecick v. School District No. 18 of Cochise County*, 2 Ariz. App. 115, 406 P.2d 750 (1965).

Industrial was in a far different situation from that of Lev Zetlin. Industrial was the supplier to Lutz as the low bidder of four companies that sought the opportunity to fabricate the louvers needed by Lutz under the Lutz/Perini contract. The record is not that specific, but it can be assumed that Lutz furnished the plans and specifications it had received from Perini to the suppliers that bid to fabricate the louvers. As stated, Industrial was the low bidder, and it submitted shop drawings in support of its bid. These were the shop drawings that were returned to Lutz not approved with the air-leakage requirement noted thereon.

We recognize there is disagreement over what Sterriker of Industrial Louvers and Mr. Lutz of Lutz Engineering said during their telephone conversation. However, some facts about that exchange are clear. Sterriker said that the air-leakage requirement was a new specification and not noted in the original specifications. He also said that his company could not comply with the new requirement for the price quoted. Mr. Lutz responded in one of two ways. He said either that Sterriker must comply or protest in writing or, alternatively, that Sterriker could ignore the air-leakage requirement because the louvers would usually be open because of the heat generated by the welding activity. Importantly, neither of Mr. Lutz's responses would fulfill Lutz's duty under the Lutz/Perini contract.

Even believing Mr. Lutz's testimony that he advised Sterriker to comply or to protest—the apparently new leakage requirement would certainly qualify as an inconsistency that Lutz was obligated under the Lutz/Perini contract to bring to Perini's attention. Lutz not only failed to inform Perini about the exchange but also failed to inquire of Perini the significance of the new requirement. In addition, Lutz accepted the revised shop drawings and passed them on to Perini without comment. Surely Perini was entitled to notice from Lutz or warning that the air-leakage requirement might not be covered. Mr. Lutz cannot say, as he did at trial, that he assumed the new shop drawings complied with the air-leakage requirement. He testified that he had thirty years of experience in the ventilating, heating, and air-conditioning business. By his own admission he was quite capable of reading design plans and specifications, including those relating to

louvers. Lutz Engineering had a contractual obligation to be sure that the new shop drawings did comply. In the face of a clear duty to clarify the issue with Perini, Lutz remained silent. It is interesting to note that later, after the controversy had arisen, Sterriker wrote a letter to Perini in which he related the substance of his telephone conversation with Mr. Lutz. A copy of that letter was sent to Mr. Lutz, and again he remained silent.

Silence, we have said, when there exists a duty not to remain silent, can be a basis for estoppel. Where circumstances so require, one must speak lest such silence reasonably mislead another. *Schiavulli v. School Committee of North Providence*, 114 R.I. 443, 334 A.2d 416 (1975); *Martines v. Terminal Methods, Inc.*, 101 R.I. 599, 225 A.2d 790 (1967).

The evidence presented clearly entitled Industrial to an appropriate instruction on the law of estoppel. And although the trial justice did give an instruction on the law of estoppel, it did not go far enough in the circumstances. After correctly explaining estoppel, the trial justice then said:

> "In order for estoppel to apply, the following elements must exist; one, there must have been an affirmative representation or equivalent conduct by the party against whom the estoppel is to be applied; that is, the plaintiff in this case, Lutz Engineering; two, the representation must be made for the purpose of inducing the other party to act or fail to act in reliance on that representation; and three, the representation or conduct did induce the other party to act or fail to act to his detriment."

The trial justice declined defendant Industrial's request for further instruction on estoppel by silence. The defendant had requested the following: "Silence, when there is a duty to speak, is sufficient to cause a party to be estopped from asserting a claim." The defendant had cited as authority for its request *Gross v. Glazier*, 495 A.2d 672 (R.I.1985); *Loiselle v. City of East Providence*, 116 R.I. 585, 359 A.2d 345 (1976); and *Schiavulli v. School Com-*

*mittee of North Providence*, 114 R.I. 443, 334 A.2d 416 (1975).

During his cross-examination, Mr. Lutz testified that he admitted to Sterriker during their telephone conversation that the 1.75 cfm air-leakage requirement was not in the original specifications. Mr. Lutz acknowledged that Sterriker said that Industrial could not and would not manufacture a louver to meet the requirement for the contract price. Mr. Lutz also acknowledged that he never alerted Perini to the problem.

The instruction given to the jury discussed affirmative representation or equivalent conduct but not silence as a basis for estoppel. We feel that the language used could very well have been too subtle to inform the jurors fully of the fact that Mr. Lutz's silence in this situation, if they believed it constituted an estoppel, would warrant a verdict for defendant. The failure to give the requested instruction was error as a matter of law. *Armstrong v. Polaski*, 117 R.I. 565, 369 A.2d 249 (1977).

For these reasons the defendants' appeals are sustained. The judgment against Lev Zetlin Associates is reversed. The judgment against Industrial Louvers, Inc., is vacated, and that case is remanded to the Superior Court for a new trial.

KELLEHER, J., did not participate.